**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1340-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JERRY M. REYES, a/k/a
JERRY M. RODRIGUEZ,

     Defendant-Appellant.

_____

Argued October 20, 2021 – Decided January 13, 2022

Before Judges Fuentes, Gooden Brown, and Gummer.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 16-06-1877.

Cody T. Mason, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Cody T. Mason, of counsel and on the briefs).

Natalie A. Schmid Drummond, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Jill S. Mayer, Acting Camden County Prosecutor, attorney; Linda A. Shashoua,

Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Jerry M. Reyes appeals from a judgment of conviction for murder and related weapons offenses. Based on our review of the record in light of applicable law, we are convinced the cumulative effect of multiple errors committed before and during the trial rendered the trial unfair. Accordingly, we reverse defendant's convictions, vacate his sentence, and remand for further proceedings.

## I.

The jury heard testimony that on March 12, 2016, Luis "Cito" Feliu died from the injuries he sustained after being shot twice in Camden near the barbershop where he worked.

At about 5:20 p.m. that evening Camden County police officer Antonio Gennetta went to the scene of the shooting after first hearing that another officer was responding to "a fight call" in the area and then learning shots had been fired. He found at the scene a large crowd of people and Feliu, laying on the ground, bleeding and unresponsive. Gennetta placed him in his patrol car and drove to a hospital, where Feliu succumbed to his injuries.

At the hospital, Detectives Michael Sutley and Shawn Donlon met Feliu's fiancé Jeanne Castillo, who had been present at the shooting. She gave the detectives the nickname and physical description of the shooter. That evening the detectives interviewed three other people who had witnessed the shooting: Michael Cubbage, Louis Vasquez, and Shawn Cole, none of whom testified at trial. Sutley testified that based on those interviews, he identified defendant as a suspect.

> [PROSECUTOR:] So, as the night progresses, as you're continuing your investigation, did you locate any potential witnesses that night to what had occurred earlier in that evening?
>
> [SUTLEY:] Yeah, . . . we had spoken to three . . . additional witnesses other than Jeanne Castillo, who is referred to as Jenn.
>
> [PROSECUTOR:] Okay. And did you interview these individuals?
>
> [SUTLEY:] We did.
>
> [PROSECUTOR:] Okay. And . . . do you recall their names?
>
> [SUTLEY:] It was Michael Cubbage, Louis Vasquez and . . . Shawn Cole.
>
> [PROSECUTOR:] Okay. All right. And based on these interviews that you conducted the night of the murder, did you develop a suspect?

A-1340-18

[SUTLEY:]  Yes, we did.

[PROSECUTOR:]  Okay.  And what was the suspect's name?

[SUTLEY:]  Jerry Reyes.

In the early morning hours of the next day, Sutley conducted a second interview of Castillo.

[PROSECUTOR:]  And what was the purpose of conducting this interview?

[SUTLEY:]  Now that we had developed a suspect, we wanted to present her with . . . a photo to see if we can get an identification.

Another detective, who was not otherwise involved in the investigation, presented Castillo with a photo array prepared by Sutley of eight individuals: defendant because he was a suspect and seven other individuals having similar physical characteristics.  Castillo identified defendant's photograph from the array.

When asked at trial how she knew the person in the photograph, Castillo responded:  "He had shot Luis."  She testified she had first seen defendant two or three days before the shooting, when she had dropped Feliu off at a corner store and had seen him walk across the street and talk to defendant.  On the day of the shooting, Castillo was with Feliu at the barbershop.  Feliu left the

4

barbershop and went with a friend down the block to a corner store. When he returned, he was angry and acting like he was preparing for a fight. Castillo saw defendant standing outside the barbershop with other people. She described defendant as being "kind of jumpy" and "[i]nstigating," trying to get Feliu to come outside, although she could not hear what defendant was saying. Eventually, Feliu ran outside and met defendant in the street. From inside the barbershop, Castillo could see Feliu "in like a fighting position . . . with his fists up" and then with "his hands up like he was surrendering." She heard a gunshot and saw Feliu run, with defendant chasing after him. She tried to go outside, but someone pushed her back into the shop. She saw defendant "come in front of the barbershop window and pull out the gun and shoot him." She did not actually observe Feliu being shot but saw defendant point and fire his gun in Feliu's direction.

After the conclusion of the photo array, Sutley and Donlon contacted an assistant prosecutor who authorized them to charge defendant with Feliu's murder. Police arrested defendant on March 15, 2016. That afternoon Sutley and Donlon interrogated defendant, a recording of which was played for the jury. Before beginning the interrogation, Sutley read defendant his Miranda rights,

5

<u>Miranda v. Arizona</u>, 384 U.S. 436 (1966); defendant acknowledged understanding them and signed the <u>Miranda</u> waiver form.

Defendant told the detectives he had known Feliu since high school. The week before the shooting, defendant and Feliu had what defendant described as a "major argument." On the day of the shooting, defendant wanted to fight Feliu because he believed Feliu had disrespected him. Defendant saw Feliu and suggested they fight behind a store near the barbershop. Instead, Feliu went into the barbershop and defendant waited for him outside. Eventually, Feliu exited the shop, approached defendant, and attempted to punch him but missed and hit defendant's female friend, someone defendant referred to as "Sister." Feliu started to run, and defendant chased after him. When he heard a shot, defendant ran in a different direction. Later, his "ride" picked him up on another street, and defendant went home, where he called his brother and told him "I think somebody tried to kill me . . . I could have sworn somebody shot at me, man."

According to defendant, when his child's mother told him the next day "they killed Cito . . . [t]he Cito you been arguing with," defendant responded, "I thought it was for me. I thought the shots w[ere] for me." When she told him "[y]our name keep[s] coming up," he told her he had run when he heard the shots. Sutley asked defendant, "any reason they would say that you . . . shot

him?" Defendant acknowledged, "There's a reason. . . . We just had a major argument . . . I wanted to get him to fight. I was the aggressor. I wanted to fight."

After defendant denied having a gun, Sutley made multiple comments about witnesses seeing defendant with a gun. Sutley asked him, "[i]s there any reason . . . that people say that when you ran away, . . . you had a gun in your hand[?]" Defendant responded he had his phone in his hand. Sutley followed up: "people are saying that . . . when you were running away, whether you picked up a gun, saw a gun, but you were running with a gun . . . did somebody drop the gun, then, and you picked it up[?]" Defendant again denied having a gun. Sutley told him, "somebody may have said you picked up the gun or something like that and, then, you just kept running away." Defendant ultimately repeated, "I had no gun."

As part of the interrogation, detectives showed defendant a video of the incident recorded by a Realtime Tactical Operations Incident Command "Eye in the Sky" camera, located about a block from where the shooting occurred. Sutley again commented on witnesses stating defendant had a gun.

> DETECTIVE SUTLEY: We talked to all those people. Here's what those people say. Those people say: When he came back running through, and you can see all the people out here. When he came back and ran through,

A-1340-18

being Jerry -- when he came back and ran through, he was holding a gun in his hand. Nobody said you fired the gun.

DEFENDANT: Uh-huh.

DETECTIVE SUTLEY: But, they said that he was holding a gun and that's why I'm trying to figure out was it, did – did somebody drop it? Did you get it from somebody? . . .

    . . . .

I showed you this, and I -- and we talked to these people. And we try to make sense of this and I say to myself: Is -- is he scared and that's why he's running and . . . he brought a gun to the fight just in case he was jumped? Because you were -- you were outnumbered, right?

When defendant again denied having a gun in his hand, Sutley responded: "Hold on, hold on, hold on. When we speak to all these people and they say, 'As he runs away.'" Defendant maintained he did not have a gun and questioned Sutley's assertion that people had said he had a gun.

DEFENDANT: Well, that's I would like to know. I would like to know where you get that from? Why -- why they saying I have a gun?

DETECTIVE SUTLEY: I'm telling you where that –

DEFENDANT: Why they saying that they seen me running with a gun?

DETECTIVE SUTLEY: Because you had a gun.

8

DEFENDANT:  I did not have a gun.

DETECTIVE SUTLEY:  . . . they're saying that.

Sutley questioned why "these people" and "they" would lie.  Telling defendant "there's no ifs, ands or buts" that he "ended up with a gun," Sutley asserted, "they said that he was holding a gun" and "[a]ll of the people out there say the same exact thing."  Sutley told defendant, "we talked . . . to the people who were out there . . . and . . . everybody that we have spoken to, thus far, says when you were running away, that you had a gun . . . ."

While reviewing the surveillance video with defendant, both detectives repeatedly asserted the video clearly showed defendant was holding a gun.

- "See it in your right hand as you run . . . ";

- "it's clearly you running and in your right hand, . . . you're holding something";

- "Watch your right hand . . . It's clear as daylight . . . ";

- "As you're running, you're clearly holding something . . . in your right hand";

- "It's clear that when you're running, there is a gun in your hand . . .";

- "People take off because you pulled a gun out";

- "Watch.  Now look, dude, they see the gun. . . . They're all looking at you.  They're seeing a gun coming out";

9

A-1340-18

- "The only reason they're running is because the gun's out right now";

- "People are running because you pull a gun out";

- "You got [the gun] from your waistband"; and

- "You pulled a gun out right there . . . it's obvious."

After defendant repeatedly stated, "[t]here was no gun," Sutley told him, "you can watch it" and Donlon said, "you see it!"

The detectives subsequently interviewed two other witnesses who testified at trial:  Odenell Henry and John Sandy.  Sandy owned the barbershop where Feliu and Henry worked.  Sandy was presented with a photo array, selected defendant's photograph, and identified defendant as the person who was in the street fighting with Feliu.  Sandy was outside when the fight began.  When he heard someone shout, "he got a gun," Sandy ran in the other direction.  As he was running, he heard gunshots.  At trial, Henry described the person with whom Feliu had fought and identified him as "Jerry."  Sometime after the fight began, Henry saw Feliu run past him, chased by "Jerry," who had a gun.

Brandon Rice, an acquaintance of defendant, was questioned by detectives five months after the shooting and two months after he had been arrested on an unrelated weapons charge.  He pleaded guilty to the weapons charge, agreed to testify against his co-defendant, and was sentenced to probation.  Rice asserted

A-1340-18

he was not required to speak with Camden detectives as part of his plea deal and was not promised anything in exchange for speaking with them. At trial, Rice testified on the day after the shooting, defendant had confessed to killing Feliu. According to Rice, defendant told him Feliu had attempted to punch him but hit defendant's girlfriend instead. Defendant was "caught off guard by the swing, and he turned around, reacted and shot" Feliu. Defendant then "[r]an down the alleyway, [and] stashed the gun." Defendant asked Rice to retrieve the gun from where he had hidden it, but Rice declined. Instead, five months later, Rice told detectives where defendant had told him he hid the gun. Law enforcement officials never located the weapon.

## II.

On June 30, 2016, a grand jury returned a four-count indictment charging defendant with first-degree murder, N.J.S.A. 2C:11-3(a)(1)-(2); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a); second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b); and second-degree being a certain person not permitted to possess a handgun, N.J.S.A. 2C:39-7(b).

A.

More than four months before the trial, the trial judge conducted a N.J.R.E. 104 hearing regarding the voluntariness of the statements defendant made to detectives during their interrogation. The judge found defendant had made the statements freely and voluntarily and held the State could play at trial the recording of the interrogation. The judge noted, and the prosecutor agreed, that some portions of the video should be redacted. Defense counsel expressly requested the redaction of the detectives' statements about defendant having a gun, contending "it's almost as [if] they were testifying as to what was on the video." The trial judge agreed, finding it "inappropriate for the detectives to give their take on what happened." The judge also indicated a curative instruction might be needed. Defense counsel stated he would provide the State with a list of proposed redactions and would ask the judge to resolve their disputes. Despite that discussion, the recording was played at trial without redaction or curative instruction.

Defense counsel also asked the references to "everybody else saying he had a gun" be redacted. The judge denied that request.

> THE COURT: -- that's something else. I think we get into everybody else said you had a gun, I'm not saying that's an appropriate investigatory technique, but I'm saying that at least part of where they're saying you see

A-1340-18

this, don't you agree people usually run to the fight not away from the fight, I mean those kinds of comments I think are appropriate.

## B.

Almost four years before the trial, defendant sent to the trial judge a letter dated August 8, 2016, asking, among other things, that his attorney, who was a public defender, send him his "'full discovery' such as all 'statements' from all witnesses, . . . 'original statements,' [and] my 'grand jury transcripts.'" On October 11, 2016, defendant sent another letter to the trial judge, advising his attorney still had not provided him with the requested "full discovery" or transcripts and asserting his attorney "is not doing his job." He told the judge he needed "a competent attorney to help [him]." After receiving each letter, the judge advised defendant in writing he could not respond but would forward his correspondence to defense counsel for review and reply.

On January 3, 2017, the court received from defendant a handwritten "Notice of Motion to Relieve Counsel." Defendant asked the court to relieve defense counsel and appoint "replacement counsel." He supported the motion with his certification, detailing why he was dissatisfied with his counsel, including counsel's purported failure to respond to defendant's requests for information and his "complete lack of communication."

A-1340-18

The record is devoid of any evidence that the court scheduled defendant's motion for oral argument or addressed his request for new counsel in any pretrial conference. Instead, more than a year and a half later, on July 26, 2018, the first day of trial, defendant requested and was permitted to express his concerns.

> DEFENDANT: I want to let the Court know that I'm ready to go to this trial. I'm ready for this. But what -- I am not ready to continue with my counsel. Now, I have -- numerous times, I have written -- I got all the proof in here that I have written complaining, given complaints about his unprofessionalism, how we not having communication, him not filing no motion when I ask. Proof that's on this case that I point out that he clearly shot me down, not making an effort, nothing. I've been complaining. If you would like -- you would like to see all this, I have it –
>
> THE COURT: No. I know you've sent correspondence to my chambers.
>
> DEFENDANT: Yes. Nothing to have yet found no remedy for this. Now, I have been patient enough and I say nothing, because I believe in a higher power. But me personally, I'm ready to go to this trial. There's nothing that points to it but an argument, but what a police reports on numerous witnesses a bunch of contradiction, there is nothing. Now, I have spoken to this gentleman about my concerns to no avail. Now, what can I -- what else can I do? Now I got an attorney ethics grievance form that's unprocessed. Now what can I do to change my counsel? Because he's clearly not doing nothing but –
>
> THE COURT: Sir, you have the right to hire other counsel if you so desire. Mr. Wertheimer is a very

14

experienced trial attorney, he's well-respected. You know, I know him to be incredibly professional in the way he performs before the [c]ourt. I'm sure he'll, you know, fully represent you throughout these proceedings, but he is your attorney, sir.

DEFENDANT: So I can't -- so I'm being forced to continue with my counsel that obviously we are not on the same page.

THE COURT: He is your –

DEFENDANT: Every -- my concern –

THE COURT: He is your attorney, sir. He will be representing you throughout these proceedings.

DEFENDANT: So I can't do nothing to –

THE COURT: Well, I mean, you had the right to hire your own attorney. I mean, if you're going to go through the Public Defender's Office, he has been assigned as your attorney. As I said, he's a professional -- extremely professional the way he represents clients. He's a very experienced attorney, and he is your attorney. All right, sir?

DEFENDANT: So all my complaints will be –

THE COURT: Your complaints are noted; all right?

DEFENDANT: No problem. Thank you.

And with that, the trial judge proceeded with jury selection.

A-1340-18

C.

After three days of trial, the trial judge provided counsel with draft jury instructions and conducted a charge conference pursuant to Rule 1:8-7(b).

The trial judge did not include in the jury instructions a Henderson[1] identification charge. The judge had asked counsel for their views on whether it should be included. Defense counsel, after having an overnight to consider the issue, told the judge the charge was not relevant because the case did not involve an identification issue.

During the charge conference, defense counsel initially requested, based on Rice's testimony, a "cooperating witness charge," presumably following Model Jury Charges (Criminal), "Testimony of a Cooperating Co-Defendant or Witness" (rev. Feb. 6, 2006). He subsequently withdrew that request, stating "I don't think it applies. There's no present expectation of any favor." With no objection, the judge included an instruction based on the model charge for "Credibility - Prior Conviction of a Witness." See Model Jury Charges (Criminal), "Credibility - Prior Conviction of a Witness" (rev. Feb. 24, 2003).

At the charge conference the trial judge advised counsel he intended to instruct the jury on murder and the lesser-included offenses of aggravated

---

[1] State v. Henderson, 208 N.J. 208 (2011).

manslaughter and reckless manslaughter. The judge granted defense counsel's request to include a passion/provocation manslaughter charge, prepared and provided counsel with revised jury instructions and a revised verdict sheet, and, with no objection from counsel, charged the jury accordingly.

As to the passion/provocation manslaughter charge, the trial judge included the following language based on the model charge, Model Jury Charges (Criminal), "Murder, Passion/Provocation and Aggravated/Reckless Manslaughter (N.J.S.A. 2C:11-3a(1) and (2); 2C:11-4a, b(1) and b(2))" (rev. June 8, 2015):

> If, on the other hand, you determine the State has not disproved at least one of the factors of passion provocation manslaughter beyond a reasonable doubt, but that the State has proven beyond a reasonable doubt that the defendant purposely or knowingly caused death or serious bodily injury resulting in death, then you must find him guilty of passion provocation manslaughter.
>
> If, however, the State has failed to prove beyond a reasonable doubt that the defendant purposely or knowingly caused death or serious bodily injury resulting in death, you must find the defendant not guilty of murder and passion provocation manslaughter and go on to consider whether the defendant should be convicted of the crimes of aggravated or reckless manslaughter.

But, when explaining the verdict sheet, the judge stated:

To assist you in reporting a verdict I have prepared a verdict sheet for you. You will have this with you in the jury room. The verdict form is not evidence. The form is only to be used to report your verdict, and the verdict sheet is as follows. It sets forth the various offenses set forth in the indictment; Count [One], charges the defendant with murder, and you would make a determination as to either not guilty or guilty. As a lesser included offense of murder is passion provocation manslaughter. If you find the defendant guilty of murder, you would not answer any of the following questions. But if you find him not guilty of murder, you would respond to the question of whether or not he was guilty or not guilty of passion provocation manslaughter.

Again, if you find the defendant guilty of that offense, you would go to the next Count. If you find him not guilty, you would consider the charge of aggravated manslaughter, and then following that if you find him not guilty you would consider the charge of reckless manslaughter.

The model jury charge for "murder, passion/provocation and aggravated/reckless manslaughter" includes a sample verdict sheet containing the following questions and instructions:

QUESTION NUMBER ONE

On the charge of Murder, we find the defendant:

1a. Not Guilty of Murder _____

1b. Guilty of Passion/Provocation Manslaughter _____

1c. Guilty of Murder _____

18                                                    A-1340-18

<u>If you have found the defendant Not Guilty of Murder, go to question number two.</u>

<u>If you have found the defendant Guilty of Murder, please answer the following:</u>

Do you find that the defendant committed the Murder by his/her own conduct?

_____          _____
Yes            No

QUESTION NUMBER TWO

On the charge of Aggravated Manslaughter, we find the defendant:

2a. Not Guilty of Aggravated Manslaughter     _____

2b. Guilty of Aggravated Manslaughter     _____

If you have found the defendant Not Guilty of Aggravated Manslaughter, go to question number three.

<u>(INSERT IF ADDITIONAL CHARGES: If you have found the defendant guilty of question number 2b, go to Question Four)</u>

QUESTION NUMBER THREE

On the charge of Reckless Manslaughter, we find the defendant:

3a. Not Guilty of Reckless Manslaughter     _____

3b. Guilty of Reckless Manslaughter     _____

19

A-1340-18

[INSERT ADDITIONAL CHARGES IF APPROPRIATE]

PLEASE ADVISE THE SHERIFF'S OFFICER THAT YOU HAVE REACHED A VERDICT.

For reasons not explained on the record, the trial judge did not use the sample verdict sheet provided in the model jury charge but instead used a verdict sheet that included headings, preambles containing language from the indictment, and a different set of questions. As to the murder count, the verdict sheet contained the following:

MURDER

COUNT 1 of the indictment charges that on or about the 12th day of March, 2016, in the City of Camden, in the County of Camden, aforesaid, and within the jurisdiction of this Court, JERRY M. REYES did purposely or knowingly cause the death or serious bodily injury resulting in the death of Luis Feliu, contrary to the provisions of N.J.S. 2C: 11-3a (1)(2) and against the peace of this State, the Government and dignity of the same.

a. On the charge of murder of Luis Feliu our verdict is:

NOT GUILTY ____          GUILTY ____

If you find the defendant GUILTY, skip the following questions and go on to Count 2.

If you find the defendant NOT GUILTY, please answer the following question.

20                                          A-1340-18

b. On the charge of passion/ provocation manslaughter of Luis Feliu our verdict is:

NOT GUILTY _____  GUILTY _____

If you find the defendant GUILTY, skip the following questions and go on to Count 2.

If you find the defendant NOT GUILTY, please answer the following question.

c. On the charge of aggravated manslaughter of Luis Feliu our verdict is:

NOT GUILTY _____  GUILTY _____

If you find the defendant GUILTY, skip the following question and go on to Count 2.

If you find the defendant NOT GUILTY, please answer the following question.

d. On the charge of reckless manslaughter of Luis Feliu our verdict is:

NOT GUILTY _____  GUILTY _____

After deliberating for less than two hours, the jury found defendant guilty on all counts. On the murder-count portion of the verdict sheet, the jury checked "GUILTY" in response to question a and did not address questions b, c, or d.

The trial judge subsequently imposed an aggregate prison term of sixty-five years with periods of parole ineligibility and parole supervision as prescribed by the No Early Release Act, N.J.S.A. 2C:43-7. Specifically, the trial

21

judge merged the possession of a weapon for an unlawful purpose count with the murder count and imposed a sixty-year prison sentence for those convictions; imposed a concurrent five-year term on the conviction of unlawful possession of a weapon; and on the certain-person conviction imposed a consecutive five-year term.

D.

On appeal, defendant argues

POINT I

REVERSAL IS REQUIRED BECAUSE THE TRIAL COURT SUMMARILY DENIED DEFENDANT'S PRE-TRIAL REQUESTS FOR NEW COUNSEL WITHOUT APPLYING THE PROPER LEGAL ANALYSIS.

POINT II

REVERSAL IS REQUIRED BECAUSE THE STATE IMPROPERLY BOLSTERED ITS CASE WITH INADMISSIBLE HEARSAY ABOUT DEFENDANT BEING THE SHOOTER AND TWO DETECTIVES' OPINIONS THAT DEFENDANT WAS HOLDING A GUN IN A VIDEO.

A. The State Presented Improper Hearsay That Multiple Non-Testifying Witnesses Implicated Defendant.

22

B.     The Interrogation Video Improperly Included the Detectives' Opinions that Defendant Had a Gun in a Video.

POINT III

REVERSAL IS REQUIRED BECAUSE THE COURT WRONGLY INSTRUCTED THE JURY TO ONLY CONSIDER PASSION/PROVOCATION MANSLAUGHTER IF IT FIRST ACQUITTED ON MURDER.

POINT IV

THE COURT COMMITTED PLAIN ERROR WHEN IT FAILED TO CHARGE THE JURY ON HOW TO CONSIDER THE IDENTIFICATION, THE ALLEGED CONFESSION, OR THE POSSIBLE BIAS STEMMING FROM RICE'S PROBATION.

A.     The Court Committed Plain Error in Not Charging the Jury on the Key Issue of Identification.

B.     It Was Plain Error to Not Instruct the Jury on How to Consider the Alleged Confession and Rice's Probation.

POINT V

THE CUMULATIVE EFFECT OF THE TRIAL ERRORS DEPRIVED DEFENDANT OF DUE PROCESS AND A FAIR TRIAL AND WARRANTS REVERSAL OF HIS CONVICTIONS.

23

POINT VI

RESENTENCING IS REQUIRED BECAUSE THE TRIAL COURT BASED THE 65-YEAR SENTENCE ON IMPROPER CONSIDERATIONS AND AN UNJUSTIFIED CONSECUTIVE TERM.

A.     Resentencing Is Required Because the Court Did Not Adequately Explain the Sentence Imposed, Put Undue Emphasis on the Need for General Deterrence, and Considered Improper Factors.

B.     Resentencing Is Required Because the Court Wrongly Imposed a Consecutive Five-Year Term.

### III.

Because defendant did not object or otherwise raise before the trial court many of the legal issues he now raises on appeal, we review his arguments under the plain-error standard of Rule 2:10-2, unless otherwise indicated. See State v. Singh, 245 N.J. 1, 13 (2021) (finding "[w]hen a defendant does not object to an alleged error at trial, such error is reviewed under the plain error standard"). "[A]n unchallenged error constitutes plain error if it was 'clearly capable of producing an unjust result,'" id. (quoting R. 2:10-2) and raises a reasonable doubt as to "whether the jury came to a result that it otherwise might not have reached." State v. R.K., 220 N.J. 444, 456 (2015). When applying the plain-

error standard, we evaluate an error "in light of the overall strength of the State's case." State v. Walker, 203 N.J. 73, 90 (2010).

A.

We consider first the jury instructions and verdict sheet. "'Correct [jury] charges are essential for a fair trial,' and, therefore, 'erroneous instructions on material points are presumed to be reversible error.'" State v. Lora, 465 N.J. Super. 477, 498 (App. Div. 2020) (quoting State v. Martin, 119 N.J. 2, 15 (1990)). We "evaluate a challenged jury instruction in the context of the entire charge to determine whether the challenged language was misleading or ambiguous." Ibid. (quoting State v. Nelson, 173 N.J. 417, 447 (2002)). "Contradictory and inconsistent charges are inherently inadequate as they create a reasonable likelihood that a juror understood the instructions in an unconstitutional manner." State v. Gonzalez, 444 N.J. Super. 62, 77 (App. Div. 2016) (quoting State v. Moore, 122 N.J. 420, 433 (1991)).

1.

Passion/provocation manslaughter is applicable "when a homicide which would otherwise be murder under [N.J.S.A.] 2C:11-3, other than felony murder, is 'committed in the heat of passion resulting from a reasonable provocation.'" State v. Galicia, 210 N.J. 364, 378-79 (2012) (quoting N.J.S.A. 2C:11-4(b)(2)).

Thus, "murder can be downgraded to voluntary manslaughter by virtue of a finding of passion/provocation." Id. at 380.

In State v. Coyle, 119 N.J. 194, 223-24 (1990), our Supreme Court reversed the defendants' convictions because of erroneous instructions directing the jury not to consider passion/provocation under N.J.S.A. 2C:11-4(b)(2) unless it acquitted defendant of murder. The Court held that in a murder case containing evidence of passion/provocation, "the jury must find both purposeful homicide and an absence of passion/provocation" to convict a defendant of murder. Coyle, 119 N.J. at 223 (emphasis in the original). The charge in Coyle included a mix of language regarding the State's burden to prove murder and disprove passion/provocation, ending with an instruction that the jury did not need to consider the lesser-included offenses unless the State failed to prove murder. Id. at 222. The Court found "despite the evidence of passion/provocation in the record, the jury may have convicted [the] defendant of murder simply by finding that 'it [was] his conscious object to cause death or serious bodily injury,' without having considered the possibility of a manslaughter verdict." Id. at 222-23. The Court held the charge "so greatly risked confusion as to amount to error." Id. at 224.

A-1340-18

The charge here was similarly flawed. Although the trial judge began by following the model jury charge on "murder, passion/provocation and aggravated/reckless manslaughter," he directly contradicted that charge in his instructions on the verdict sheet.

> If you find the defendant guilty of murder, you would not answer any of the following questions. But if you find him not guilty of murder, you would respond to the question of whether or not he was guilty or not guilty of passion provocation manslaughter.
>
> Again, if you find the defendant guilty of that offense, you would go to the next Count. If you find him not guilty, you would consider the charge of aggravated manslaughter, and then following that if you find him not guilty you would consider the charge of reckless manslaughter.

Like the charge in Coyle, that instruction "had the potential to foreclose jury consideration of whether passion/provocation should reduce an otherwise purposeful killing from murder to manslaughter." Coyle, 119 N.J. at 222.

That error was compounded by the erroneous verdict sheet. Our Supreme Court has "recognize[d] the importance of the verdict sheet as 'an essential component' of the trial court's 'road map' for the jury's deliberations." State v. Cuff, 239 N.J. 321, 340 (2019) (quoting Galicia, 210 N.J. at 387). "Jurors are likely to refer, and refer often, to the directions on the verdict form." Ibid. (quoting State v. Nelson, 173 N.J. 417, 449 (2002)). "Thus, 'we encourage

completeness and consistency in the preparation of verdict sheets.'" Id. at 340-41 (quoting State v. Gandhi, 201 N.J. 161, 198 (2010)).  Because the jury instructions "serve as the jury's primary guide as it considers the charges and the evidence," errors in a verdict sheet can be regarded as harmless unless the verdict sheet was misleading.  Id. at 341.

This verdict sheet was misleading and materially differed in significant respects from the model verdict sheet.  The jurors saw a quote from the indictment that described only murder and said nothing about the lesser-included offenses.  The first question asked for their verdict only on murder.  Unlike the sample verdict sheet in the model charge, they were not asked to consider simultaneously with their verdict on murder their verdict on passion/provocation manslaughter.  That question was followed by instructions telling them to "skip" the questions about the lesser-included offenses if they found defendant guilty of murder.  The verdict sheet thereby directly contradicted the model jury charge for "murder, passion/provocation and aggravated/reckless manslaughter" and followed the erroneous portion of the jury instructions that told them if they found defendant guilty of murder, they should not answer the questions about passion/provocation and should go on to the questions about the other counts.  Like the erroneous portion of the charge, that direction "may have prevented the

A-1340-18

jury from considering passion/provocation simultaneously with its determination of defendant's guilt or innocence on the murder charge, as required by N.J.S.A. 2C:11-4(b)(2) and [Coyle], 119 N.J. [at 223-24]." Galicia, 210 N.J. at 387. Unlike the trial judge in State v. Reese, 267 N.J. Super. 278, 283 (App. Div. 1993), this trial judge did not instruct the jury that the verdict sheet did not set forth the elements of the offenses they had to consider and did not remind them after reviewing the verdict sheet the State had to disprove passion/provocation.

We reject the State's argument that the errors in the charge and verdict sheet were harmless because of the insufficient evidence of provocation. Given the low threshold for a charge on a lesser-included offense, see Coyle, 119 N.J. at 224, the passion/provocation manslaughter charge was warranted. See State v. Erazo, 126 N.J. 112, 125 (1991) (quoting N.J.S.A. 2C:1-8(e)) (finding the standard to be "whether the evidence provided a 'rational basis' for a passion/provocation charge"); Coyle, 119 N.J. at 226 (finding "a third person can be provoked when a close friend suffers injury or abuse under circumstances that would constitute adequate provocation had the third person been the object of abuse"). The alleged provocation, punching a girlfriend or a "sister," was adequate and the "intervening time was short enough that defendant did not have

time to cool off from that provocation." State v. Carrero, 229 N.J. 118, 131 (2017). The jury could have found, consistent with his alleged confession to Rice, that defendant shot Feliu in reaction to Feliu punching his female friend.

The errors in the charge and verdict sheet were not harmless. Because the erroneous instructions and verdict sheet were capable of producing an unjust result, we hold they constitute plain error warranting reversal. See State v. Montalvo, 229 N.J. 300, 323 (2017).

2.

Defendant faults the trial judge for failing to give the jury an identification instruction. "[W]hen identification is a fundamental or an essential issue at trial, 'the defendant ha[s] a right to expect that the appropriate guidelines w[ill] be given, focusing the jury's attention on how to analyze and consider the factual issues with regard to the trustworthiness' of in-court identifications." State v. Robinson, 165 N.J. 32, 41 (2000) (quoting State v. Green, 86 N.J. 281, 292 (1981)). "[J]uries must receive thorough instructions tailored to the facts of the case to be able to evaluate the identification evidence they hear." Henderson, 208 N.J. at 302. In cases in which identification is a key issue, the trial court must instruct the jury on identification, even if a defendant does not make that

request.  State v. Cotto, 182 N.J. 316, 325 (2005).  Identification is a key issue when "[i]t [is] the major . . . thrust of the defense."  Green, 86 N.J. at 291.

Although defendant agreed he was present for and participated in a physical altercation with Feliu, he denied being the shooter.  Castillo at trial specifically identified defendant as the shooter.  That discrepancy was sufficient to make defendant's identification as the shooter a fundamental and essential trial issue.  The trial judge erred in not giving the identification charge.

If failure to give the identification instruction were the only issue in this appeal, our inquiry would not end there.  We would consider whether the failure to give the instruction was invited error given defense counsel's statement to the judge that the instruction was not relevant, see State v. Bailey, 231 N.J. 474, 490 (2018), and, if not invited error, whether it was plain error, considering "the strength and quality of the State's corroborative evidence rather than . . . whether defendant's misidentification argument is convincing."  Cotto, 182 N.J. at 32.  Because we already found reversible error in the jury instructions and verdict sheet on the passion/provocation manslaughter issue, we need not decide whether the trial court's failure to give the identification instruction was invited or plain error.

31

3.

Defendant faults the trial judge for failing to give the jury a Hampton/Kociolek[2] charge based on defendant's alleged statement to Rice. In a Hampton/Kociolek charge, a trial judge instructs the jury its "function [is] to determine whether or not [any written or oral] statement was actually made by the defendant, and, if made, whether the statement or any portion of it is credible." See Model Jury Charges (Criminal), "Statements of Defendant-Allegedly Made" (rev. June 14, 2010). "The principal value of the Kociolek charge is to cast a skeptical eye on the sources of inculpatory statements attributed to a defendant." State v. Harris, 156 N.J. 122, 183 (1998); see also State v. Feaster, 156 N.J. 1, 72 (1998) (holding the "purpose of a Hampton charge is to call the jury's attention to the possible unreliability of the alleged statements made by a criminal defendant"). Although Hampton applies to statements made to police witnesses, Kociolek is not so limited. State v. Wilson, 335 N.J. Super. 359, 367 (App. Div. 1999), aff'd, 165 N.J. 657 (2000).

A judge is required to give the Hampton/Kociolek instruction whether or not requested by a defendant. State v. Jordan, 147 N.J. 409, 425 (1997). The trial judge erred in failing to give the charge. Because we already found

_____

[2] State v. Hampton, 61 N.J. 250 (1972); State v. Kociolek, 23 N.J. 400 (1957).

reversible error in the jury instructions and verdict sheet on the passion/provocation manslaughter issue, we need not decide whether the trial court's failure to give the Hampton/Kociolek instruction was plain error, given defense counsel's failure to request it, or invited error, given defense counsel's reliance in his closing argument on Rice's testimony about defendant's statement to support his contention that if the jury found defendant was the shooter, they should find him guilty of passion/provocation manslaughter, not murder.

4.

Defendant faults the trial judge for not instructing the jury about Rice's "probationary status." "[A] charge against a prosecution witness that is unrelated to the current charge against the defendant may be an appropriate topic for cross-examination." State v. Bass, 224 N.J. 285, 304 (2016). "[A] charge need not be pending at the time of trial to support an inference of bias." Ibid. Even "a charge against a witness that has been resolved by dismissal or sentencing before the witness testifies may be an appropriate subject for cross-examination." Ibid.

Defendant took advantage of the full and fair opportunity he received to cross-examine Rice regarding his contact with police, his plea agreement and the probationary term he had received in the unrelated matter, and his possible

bias in testifying.   Having asked for and withdrawn his request for a "cooperating witness charge," he now faults the trial judge for failing to give that charge.  We see no error.

In the notes to the model jury charge on "Testimony of a Cooperating Co-Defendant or Witness," trial judges are cautioned against giving the charge if not requested by the defendant.

> This charge should not be given except upon the request of defense counsel.  "While a defendant is entitled to such a charge if requested and a judge may give it on his own motion if he thinks it advisable under the circumstances, it is generally not wise to do so absent a request, because of the possible prejudice to the defendant.  State v. Begyn, 34 N.J. 35, 54-56 (1961); State v. Gardner, 51 N.J. 444, 460-61 (1968). Certainly, it is not error, let alone plain error, for a trial judge to fail to give this cautionary comment where it has not been requested."  State v. Artis, 57 N.J. 24, 33 (1970).
>
> [Model Jury Instructions (Criminal), "Testimony of a Cooperating Co-Defendant or Witness" (rev. Feb. 6, 2006), n.1].

We see no reason for the trial judge to have deviated from that sound direction in a case in which defense counsel withdrew the request for the charge and subsequently in his closing argument relied on the witness's testimony in support of his assertion that, if the jury found defendant was the shooter, it should find him guilty of passion/provocation manslaughter, not murder.

34

B.

We now address defendant's requests and motion for new counsel. "The Sixth Amendment of the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution both guarantee all defendants in criminal prosecutions the right to have the assistance of counsel for their defense." State v. Outland, 245 N.J. 494, 505 (2021). Although that right generally includes a defendant's right to the counsel of his or her choice, "an indigent defendant who is represented by appointed counsel does not enjoy a right to choose counsel." State v. Kates, 426 N.J. Super. 32, 43 (App. Div. 2012), aff'd, 216 N.J. 393 (2014). Rather, "[t]he Office of the Public Defender retains the flexibility to substitute one attorney from its office for another." Ibid. "[A] court may not require the Public Defender to assign new counsel to a defendant who was dissatisfied with the attorney assigned to represent him, absent a showing of 'substantial cause.'" State v. Coon, 314 N.J. Super. 426, 438 (App. Div. 1998).

We don't know whether substantial cause merited a change of counsel because the trial judge did not perform a substantial-cause analysis. We recognize that a letter is not a motion. Ducey v. Ducey, 424 N.J. Super. 68, 73 n.2 (App. Div. 2012) ("the use of correspondence must not be a substitute for a motion when presenting a party's request for specific relief"); see also R. 1:6-2.

And we understand why the trial judge did not treat defendant's August 8, 2016 and October 11, 2016 correspondence as motions. But that does not explain why the trial judge failed to address defendant's repeatedly-raised concerns about his counsel at one of the pretrial conferences, such as the plea cut-off conference.[3] See R. 3:9-1(c) and (d).

Simply "not[ing]" on the first day of trial defendant's complaint about his counsel is not enough to ensure the protection of defendant's Sixth Amendment rights. See Martel v. Clair, 565 U.S. 648, 664 (2012) (finding "courts cannot properly resolve substitution motions without probing why a defendant wants a new lawyer"); United States v. Iles, 906 F.2d 1122, 1130 (6th Cir. 1990) (holding when an indigent defendant timely moves for new appointed counsel, a trial court must determine the reasons for defendant's dissatisfaction with existing appointed counsel). Unlike the defendant in State v. Maisonet, 245 N.J. 552, 561 (2021), who asked the court right before jury selection began for an adjournment to obtain new counsel, defendant first raised concerns about his

---

[3] Defendant claimed defense counsel allegedly failed to provide him with discovery material and did not keep him fully inform about his defense strategy. We do not express any opinion or reach any conclusion about the merit of defendant's allegations. However, we note that an attorney has an ethical duty to keep the client "fully inform[ed]" and explain "how, when, and where the client may communicate with the lawyer." RPC 1.4(a).

counsel almost four years before trial and formally moved for new counsel almost eighteen months before trial. Based on the record containing defendant's unopposed assertions regarding the breakdown in communication with counsel and other alleged failings of counsel, we cannot conclude his motion would have or should have been denied. Failure to decide defendant's timely-submitted motion and address substantively his concerns was reversible error.

C.

We now turn to defendant's assertion that the trial judge erred in permitting the State to "bolster[]" its case improperly by presenting inadmissible hearsay or opinion testimony about defendant being the shooter, specifically Sutley's testimony that his interviews of Cubbage, Vasquez, and Cole led him to identify defendant as a suspect; Sutley's testimony that he interviewed Castillo a second time because "[n]ow that we had developed a suspect, we wanted to present her with . . . a photo to see if we can get an identification"; the multiple statements Sutley made during defendant's interrogation about unnamed people saying defendant had a gun; and the multiple assertions about defendant holding a gun the detectives made while watching the surveillance video with defendant during his interrogation.

A-1340-18

We "defer to a trial court's evidentiary ruling absent an abuse of discretion." State v. Garcia, 245 N.J. 412, 430 (2021). We "will not substitute our judgment unless the evidentiary ruling is 'so wide of the mark' that it constitutes 'a clear error in judgment.'" Ibid. (quoting State v. Medina, 242 N.J. 397, 412 (2020)). When the appealing party failed to object to the evidentiary ruling at trial, we review it under the plain-error standard. Singh, 245 N.J. at 13. An evidentiary decision is reviewed de novo if the trial court applied the wrong legal standard in admitting or excluding the evidence. State v. Trinidad, 241 N.J. 425, 448 (2020). Only a mistaken evidentiary ruling having "the clear capacity to cause an unjust result" will lead to a reversal of a conviction. Garcia, 245 N.J. at 430.

1.

"The Sixth Amendment to the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution guarantee a criminal defendant the right to confront 'the witnesses against him.'" Medina, 242 N.J. at 412 (quoting U.S. Const. amend. VI; N.J. Const. art. I, ¶ 10). The right of confrontation, which is exercised through cross-examination, is "an essential attribute of the right to a fair trial." State v. Branch, 182 N.J. 338, 348 (2005).

"[B]oth the Confrontation Clause and the hearsay rule are violated when, at trial, a police officer conveys, directly or by inference, information from a non-testifying declarant to incriminate the defendant in the crime charged." Branch, 182 N.J. at 350; see also State v. Weaver, 219 N.J. 131, 151 (2014) (finding "testimony of a witness who directly or indirectly provides information derived from a non-testifying witness that incriminates a defendant" is "generally forbid[den]" at trial); State v. Bankston, 63 N.J. 263, 268-69 (1973) (holding detective's disclosure of information received from an informant while explaining reason for arresting defendant contravened defendant's Sixth Amendment right to confront witness against him). "When the logical implication to be drawn from the testimony leads the jury to believe that a non-testifying witness has given the police evidence of the accused's guilt, the testimony should be disallowed as hearsay." Bankston, 63 N.J. at 271.

That is exactly what happened here. Sutley's testimony that the interviews of Cubbage, Vasquez, and Cole led him to identify defendant as a suspect created the "inescapable inference" Sutley received information from them implicating defendant in the crime. Ibid.; cf. State v. Kemp, 195 N.J. 136, 155 (2008) (finding defendant's right to confrontation was not violated because "all of the sources who led [the detective] to focus on defendant testified and were

cross-examined at defendant's trial"). Sutley's testimony that he interviewed Castillo a second time because after the interviews of Cubbage, Vasquez, and Cole, he had developed defendant as a suspect "[swept] in inadmissible hearsay," implied he had "information suggestive of the defendant's guilt," and was irrelevant and highly prejudicial. Branch, 182 N.J. at 352. "The jury only needed to know that the police fairly displayed the photographs to the witnesses and that the process led to a reliable identification." Ibid. Sutley's repeated assertions during the interrogation that unnamed people had described defendant as holding a gun – effectively naming him as the shooter – directly conveyed to the jury he had obtained from numerous non-testifying witnesses knowledge incriminating defendant. See Branch, 182 N.J. at 351 (holding "a police officer may not imply to the jury that he possesses superior knowledge, outside the record, that incriminates the defendant"). Sutley's hearsay testimony deprived defendant of his constitutional right to confront the witnesses against him.

2.

Defendant argues that the detectives' repeated assertions about defendant having a gun during their recorded interrogation of defendant, which was played for the jury, were improper expressions of lay opinions. The State contends they were not intended as opinions but mere and obvious interrogation tactics.

40

However labeled, the detectives' repeated assertions that defendant had a gun were improper, highly prejudicial, and capable of producing an unjust result.

N.J.R.E. 701, which governs lay witness opinion testimony, states: "[i]f a witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences may be admitted if it: (a) is rationally based on the witness' perception; and (b) will assist in understanding the witness' testimony or determining a fact in issue." "The purpose of N.J.R.E. 701 is to ensure that lay opinion is based on an adequate foundation." Neno v. Clinton, 167 N.J. 573, 585 (2001); see also Singh, 245 N.J. at 14. Lay opinion testimony can be admitted "[only] if it falls within the narrow bounds of testimony that is based on the perception of the witness and that will assist the jury in performing its function." State v. McLean, 205 N.J. 438, 456 (2011); see also id. at 459 (a witness may not offer a lay opinion on a matter "not within [the witness's] direct ken . . . and as to which the jury is as competent as he to form a conclusion") (quoting Brindley v. Firemen's Ins. Co., 35 N.J. Super. 1, 8 (App. Div. 1955)).

The detectives' numerous assertions that defendant was holding a gun were not "fleeting." See Singh, 245 N.J. at 17 (finding detective's two references to a person in a surveillance video he was narrating as "the defendant" to be error but harmless error given its fleeting nature). Unlike the detective in Singh,

245 N.J. at 20, who, as the arresting officer, had first-hand knowledge of the sneakers about which he testified, these detectives had no first-hand knowledge of the gun, which was never recovered, or of what happened during the shooting, which they had not personally witnessed. Their statements were based on their review of the surveillance video and, thus, were not "rationally based on [their] perception" of the actual events, as required by N.J.R.E. 701. The jury was no less competent than the detectives to form a conclusion as to what the surveillance video depicted.

Given that defendant admitted to being present at the shooting, the only material factual issues in dispute were whether defendant had a gun and was the shooter. Like the officer in McLean, 205 N.J. at 445, who testified as to an ultimate determination that the defendant was engaging in drug transactions, these detectives repeatedly stated their opinion as to the ultimate critical issue: defendant had a gun.

> Police testimony concerning a defendant's guilt or veracity is particularly prejudicial because "[a] jury may be inclined to accord special respect to such a witness," and where that witness's testimony goes "to the heart of the case," deference by the jury could lead it to "ascribe[] almost determinative significance to [the officer's] opinion."
>
> [State v. Tung, 460 N.J. Super. 75, 102 (App. Div. 2019) (quoting Neno, 167 N.J. at 586-87).]

42

See also State v. Frisby, 174 N.J. 583, 595 (2002) (finding the admission of certain police testimony to be plain error, noting "[t]he effect of the police testimony essentially vouching for" the version of events contrary to a defendant's version "cannot be overstated").  The detectives repeatedly asserted defendant had a gun while defendant repeatedly denied having a gun.  Their numerous assertions regarding that critical issue, especially in the face of defendant's repeated denials, were highly prejudicial.

The State's contention that the detectives' assertions reflected interrogation tactics and not opinion is not persuasive.  The prosecutor asked Sutley to explain his reason for asking defendant a particular question:  "whether [defendant] had a gun for protection."  Sutley responded:

> [SUTLEY:]  Yeah.  Sometimes when a suspect is having trouble with his recollection or facts or doesn't want to come open and be honest, one of the things that we do is we try to minimize it and give him an excuse to tell -- to tell the truth or try to explain his side of the story.  In that case, when I was offering it for protection or something like that, I was offering it for that reason.

> [PROSECUTOR:]  Okay.  And . . . is there like -- kind of like a term in terms of like interviewing tactics that that's referred to when you're trying to offer somebody a fact to accept or to reject?

> [SUTLEY:]  Well, I'm – I'm trying to minimize the overall picture, in -- in essence, is what I was trying to

43

do. Because, if I asked him why he murdered him, you would never get an answer. But, I asked if you have a gun for protection, people understand that. Sometimes, you can minimize it where they'll – they'll be a little more truthful.

[PROSECUTOR:] Okay. When you were telling him that no one said he fired a gun, what was the reason why you were telling him that?

[SUTLEY:] Again, I was trying to minimize it.

That colloquy did not make clear to the jury that the detectives' assertions about defendant having a gun were not factual statements but instead were part of an effort to elicit a confession from defendant. Without any curative instruction, anyone watching the interrogation video would understand the detectives were stating their observations from their viewing of the surveillance video and their conclusion that defendant had a gun. The prejudicial effect of those police detective statements going to the heart of the case "cannot be overstated." Frisby, 174 N.J. at 595.

The trial judge's conclusions at the pretrial N.J.R.E. 104 hearing that the interrogation video should be redacted and that a curative instruction might be needed were correct. Unfortunately, the trial judge erred in not ensuring those redactions were made and in not giving that curative instruction.

As a result of these evidential errors, the jury heard hearsay testimony regarding the statements of several named and unnamed non-testifying witnesses that violated defendant's constitutional right of confrontation and improper lay opinion testimony that was highly prejudicial. These errors had the clear capacity to cause an unjust result.

D.

"Even if an individual error does not require reversal, the cumulative effect of a series of errors can cast doubt on a verdict and call for a new trial." State v. Sanchez-Medina, 231 N.J. 452, 469 (2018); see also Weaver, 219 N.J. at 155 (finding "[w]hen legal errors cumulatively render a trial unfair, the Constitution requires a new trial"). Our "obligation is to ensure that defendant had a fair trial." State v. Jenewicz, 193 N.J. 440, 473 (2008).

Considering the individual errors and their cumulative effect, we are unable to conclude the cumulative error was harmless or that defendant had a fair trial and, thus, are constrained to vacate defendant's convictions and remand for a new trial.

E.

Because we are reversing his convictions, we need not address defendant's argument regarding the sentence.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-1340-18